ELIZABETH T. SHREVE, DEFENDANT IN ERROR, v. GEORGE W. CROSBY, PLAINTIFF IN ERROR.

Argued June 22, 1905—Decided March 12, 1906.

1. In an action for the recovery of money paid for certain shares of stock purchased by plaintiff of defendant, the contract having been rescinded by plaintiff for alleged fraud on the part of the defendant—*Held*, upon a review of the evidence returned with the bills of exceptions, that whether the shares of stock in question were sold by defendant to plaintiff, whether the contract of purchase had been affirmed by the plaintiff with knowledge of the fraud, and whether plaintiff had rescinded with due promptness after discovery of the fraud, were disputable questions for the jury's decision.

2. In view of the relation of confidence existing between the parties, of the fact that at the time defendant's fraud was discovered by plaintiff the defendant was confined to a hospital by illness, and of the other circumstances of the case—*Held*, that whether a letter written by plaintiff's representative to the defendant shortly after discovery of the fraud, containing the words: "I want to sell you my stock; what will you give me for it?" should be treated as an affirmance of the purchase, with knowledge of the fraud, or as a polite intimation that the defendant should take back the stock and return the money because of the fraud, was for the jury's determination.

3. The question being whether representations made by defendant, to the effect that a certain incorporated company owned certain large tracts of land in the State of Ohio, and that he had examined the title thereto and found it all right, were false and fraudulent—*Held*, that the testimony of an attorney and counselor-at-law of this state to the effect that he, since the repre-

sentations in question, had examined the public records of the county in which the lands in question were situate, and had found an absence of evidence upon record to show any title in the company, saving certain leases, of which copies were produced, was properly admissible as tending to show what knowledge defendant possessed at the time he made the representations.

4. Defendant having introduced in evidence a written instrument, signed by one of plaintiff's witnesses, for the purpose of impeaching the credibility of the witness by showing that the contents of the paper were inconsistent with his testimony—*Held*, admissible for the plaintiff in rebuttal to introduce parol evidence of what transpired at the time the paper was signed, in order to explain the supposed inconsistency between the instrument and the present testimony of the impeached witness.

5. The rule that parol evidence will not be admitted to vary the terms of a written contract, does not apply as between strangers to the contract, nor as between a party and a stranger.

On error to Supreme Court.

For the plaintiff in error, *Thompson & Cole.*

For the defendant in error, *Robert H. McCarter*, attorney-general, and *Eli H. Chandler*.

The opinion of the court was delivered by

PITNEY, J.  This was an action upon contract.  The declaration contained the usual combination of the common money counts in assumpsit, including claims for money had and received by the defendant for the use of the plaintiff, for money paid by the plaintiff for the use of the defendant at his request, for interest moneys, &c.  In the bill of particulars it was set forth that the action was brought to recover the sum of $7,000, paid by the plaintiff to the defendant or his order for ten thousand shares of the capital stock of the Ohio Oil Company, upon a contract of purchase by the plaintiff from the defendant, which was rescinded by the plaintiff for fraud in its procurement by the defendant, and that judgment would be demanded for the said sum of $7,000, with interest.  The plea was the general issue.  Upon trial had before one of the justices of the Supreme Court, the jury rendered a verdict in favor of the plaintiff below.  Reversal

of the consequent judgment is now sought on the ground of alleged trial errors, evidenced by bills of exceptions.

The evidence on the part of the plaintiff was in substance as follows: She and her husband, Caleb E. Shreve, were residents of Atlantic City and well acquainted with the defendant, Dr. Crosby, who for a number of years had been their family physician. In July, 1901, while Mr. Shreve was calling at the doctor's office for medical assistance, the doctor stated to him that he had some valuable oil stock for sale, and introduced to him one Peter Whitney, then present, as being another stockholder and the agent of the company. After some conversation with Dr. Crosby and Whitney, Shreve stated that he had no money to go into the investment, and did not think he would do anything in the matter, but that he would consult his wife about it. On the following morning Crosby and Whitney called at the residence of Mr. and Mrs. Shreve and the doctor opened to Mrs. Shreve the subject of selling to her some of his stock in the Ohio Oil Company; on this occasion it was suggested that the Shreves, or one of them, should buy ten thousand shares from the doctor, but no decision was reached. Several days later Dr. Crosby at his office handed to Mr. Shreve (who was acting in part for his wife and in part for himself) a printed prospectus of the Ohio Oil Company, saying: "Here are the facts, Mr. Shreve; take it home and read it over carefully." After some negotiation with the doctor about the ways and means of raising the money, loans were effected, in part by the discount of Mrs. Shreve's note at a bank in Atlantic City, of which Dr. Crosby was a director, and in part by the placing of a mortgage upon certain real estate owned by her. And in the end there were purchased from Crosby sixteen thousand five hundred shares of the stock at seventy cents per share, and the doctor was instructed by Mr. Shreve to have the certificates made out as follows: Ten thousand shares in the name of Mrs. Shreve, five hundred shares in the name of Joanna Shreve, five thousand shares in Mr. Shreve's name and one thousand shares in that of Eli H. Chandler. The consideration money for the sixteen thousand five hundred shares

amounted to $11,550. The moneys raised by the loans just mentioned were deposited to the account of Caleb E. Shreve in bank, and the purchase price of the stock was paid by his checks, delivered by him to Crosby. At Dr. Crosby's request, $4,000 of the money was paid in the form of a check to the order of Peter Whitney, for which a receipt was given, dated July 30th, 1901, as follows: "Received of Mr. Caleb Shreve $4,000 check to Peter Whitney for Ohio Oil Company stock as per contract. (Signed) George W. Crosby." The balance was paid a few days later by a check to the order of Crosby, for which the following receipt was given: "August 7th, 1901. Received of Caleb E. Shreve $7,550, to pay for Ohio Oil Company stock, as balance of sixteen thousand five hundred shares at seventy cents. (Signed) George W. Crosby." Thereafter the certificates of stock were delivered by Dr. Crosby, having been made out in accordance with the instructions of Mr. Shreve, including a certificate of ten thousand shares in the name of Mrs. Shreve. Recovery was asked for and allowed only for the $7,000 that formed the purchase price of these shares, it being conceded that the remainder of the shares included in the purchase were bought for the account of the other parties named, and not of Mrs. Shreve.

The plaintiff introduced evidence to the effect that during the interviews and negotiations that led up to this purchase of stock Dr. Crosby made certain representations to her and her husband for the purpose of inducing the purchase; that these representations were believed, were relied upon as true, and were a principal inducement to the purchase. Also, evidence tending to show that the representations were false and fraudulent.

Among these representations were the following: That the Ohio Oil Company owned three thousand two hundred acres of land in Ohio, near the town of Erhart and about twenty miles from Cleveland; that there were at the time fifty-five producing oil wells upon it, eighteen storage tanks, seventeen miles of piping, three power plants, $80,000 worth of machinery in good repair and in daily operation; that the fifty-five wells were test wells, put down to determine the value of

the property; that the land could profitably support from three to five wells per acre; that there was an ample supply of natural gas to drive the machinery of the wells; that the gas was piped to the town of Erhart; that he, Dr. Crosby, had visited the property; that he himself had stood beside one well that produced from fifty to one hundred barrels per day of thick, heavy oil, worth from $3 to $5 per barrel; that he had examined the title to the property and the books of the company and found them all right. In the printed prospectus already mentioned, which bore the name of Dr. Crosby as one of the directors of the company, these statements were reiterated and emphasized, it being distinctly stated that the property owned by the company consisted of three thousand two hundred acres, located in the counties of Lorain and Medina, Ohio.

Among the attractive statements of Dr. Crosby, according to the evidence of the plaintiff, was one to the effect that the company was already paying monthly dividends of two per cent. upon the par value of the shares, which was $1 each. Within a short time after the purchase in question was consummated, one dividend of two per cent. was paid. In the next month there was no dividend. Mr. and Mrs. Shreve became concerned regarding the investment, and he endeavored to have an interview with the doctor upon the subject After some delay, owing to the doctor's illness, the interview took place, and resulted in a general assurance by the doctor that the stock was all right and that Mr. Shreve should hold on to it. Shortly thereafter the doctor was taken to Philadelphia for medical treatment, where he remained in a hospital until near the end of the following December. Meanwhile Mr. and Mrs. Shreve were so seriously alarmed that he went to Ohio in the latter part of November and examined the property of the Ohio Oil Company. As a result he became entirely convinced of the falsity of the representations of Dr. Crosby in all material respects. Upon his return home, being unable to see the doctor on account of his absence in Philadelphia, Mr. Shreve wrote to him, on November 28th, saying: "I want to sell you my New York, New

Jersey and Ohio oil stock. What will you give for it?' And you can let $500 of the purchase-money go against the doctor's bill. I suppose dividend time is now at hand again," &c. Dr. Crosby answered, in effect, that he had no money with which to purchase the stock, but that Mr. Shreve "should hold on, and it would be all right." About the end of December, and shortly after the doctor's return to Atlantic City from the hospital, Mr. Shreve, accompanied by Mr. Chandler, counsel for him and his wife, called upon the doctor and opened the subject of the oil company. The doctor said he was too ill to discuss the matter and requested a postponement of the discussion, so that no progress was made at that time. Subsequently Dr. Crosby referred Mr. Chandler to his attorney, Mr. Hinckle, and on January 28th Chandler tendered to Hinckle the certificates for the entire sixteen thousand five hundred shares of stock that were the subject-matter of the sale in question, and also tendered $330, being the amount of money received by the purchasers as dividends upon the stock, and thereupon demanded the return from Dr. Crosby of the money paid to him, to wit, $11,550, on the ground that the purchasers repudiated and rescinded the contract for misrepresentation and fraud on the part of Dr. Crosby. This tender, and a subsequent tender of the same character made by Chandler to Dr. Crosby in person, having been refused, the present action was brought, with the result already mentioned.

Upon the trial the defendant resisted recovery upon grounds that may be summarized as follows: (1) That it was Peter Whitney who made the sale of the stock in question, and not he, the defendant; (2) that the sale of the stock was not made to Mrs. Shreve, but to her husband; (3) that with respect to many of the representations alleged, defendant did not make them; (4) that with respect to such representations as he did make, they were either true, in substance, or at least were believed on reasonable grounds to be true, and were made in good faith; (5) that as to the prospectus, he did not represent its contents to be true, but, on the contrary, said they were overdrawn and unreliable;

(6) that the contract was affirmed by the plaintiff after she had full knowledge of the alleged fraud.

Upon the close of the plaintiff's case there was a motion for nonsuit, based upon the grounds that the evidence showed no contract between the plaintiff and the defendant; that if there was such a contract it had been affirmed after the plaintiff had become aware of the fraud, and that at least there was no rescission of the contract with such promptness as to entitle the plaintiff to recover. In our opinion, the learned trial justice properly denied this motion. While there were circumstances that tended to indicate that the sale had been made by Whitney rather than by the defendant, and also to indicate that the purchase had been made by Mr. Shreve, and not by the plaintiff, there was clear evidence to the effect that it was Mrs. Shreve who purchased the ten thousand shares in question, and that it was Dr. Crosby who sold them to her. We think, also, that the trial justice properly held that whether the purchase was rescinded with due promptness, and whether the letter of November 28th (which concededly was written by Mr. Shreve, in behalf of his wife as well as of himself), amounted to an affirmance of the contract, were, under all the circumstances, disputable questions for the jury's decision. In view of the fact that shortly before the letter was written the Shreves, husband and wife, had become convinced, according to their story, that they had been grossly defrauded by Dr. Crosby, it could hardly be supposed that they were in a mood to deliberately affirm the contract. The jury could properly take into consideration the relation of confidence that had long existed between the parties, and the fact that at the time of writing the doctor was confined to a hospital by illness. We think the trial justice properly held that whether the words used—"I want to sell you my stock; what will you give me for it?"—should be treated as an affirmance of the purchase, with knowledge of the fraud, or as a polite intimation that the doctor was expected to take back the stock and return the purchase-money because of the fraud, was for the jury's determination.

It is assigned for error that the trial justice improperly

admitted the testimony of Mr. Chandler, to the effect that he had visited the property of the Ohio Oil Company; that about two-thirds of the property was in Lorain and about one-third in Medina county; and that he had made an examination of the records in Lorain county and found no deeds conveying any property to the company and no transfers of any character to the company, excepting certain assignments of leases, copies of which were produced. Error is also assigned upon the admission in evidence of a copy of the records thus found by Mr. Chandler. There was no proof that under the law of Ohio authority existed for the recording of such instruments; and it was urged that no presumption of such authority arises from the mere fact that the papers were found upon record, so that the record must be treated as a nullity and the copies not admissible. It is insisted that the sole effect of the evidence in question was to show that the oil company never had a deed for any land in fee, and thus to disprove the alleged statement of Crosby that the company owned three thousand two hundred acres of land. This argument, however, overlooks the fact that according to plaintiff's testimony Crosby said not only that the company owned the land, but that he himself had examined the title and found it all right. It was reasonable for the jury to infer from this that the doctor meant, and was understood by the plaintiff to mean, that he had examined the title by searching the public records of the counties wherein the lands were situate. For the purpose of showing the falsity of that representation, it was admissible, we think, to show by the testimony of Mr. Chandler (who is an attorney and counselor-at-law of this state, and presumably competent to discover upon the public records all that Dr. Crosby could discover) that he had examined the records of one of the counties in question—that being the county wherein two-thirds of the lands were situate—and had found an absence of evidence upon record to show title in the oil company, saving the leases of which copies were produced. The evidence tended directly to show what knowledge Crosby possessed at the time he said he had examined the company's title to the land and found it all right.

Error is assigned upon the admission of the testimony of one James A. Davis with respect to lands owned or held under lease by the Ohio Oil Company. The witness testified, without objection, that he had familiarity with the lands operated by the company; that all the wells thereon had been drilled under his supervision prior to the organization of the company; that he had been upon the lands after the organization of the company and knew about its operations and the value of its product, &c., and that he knew how the lands were held by the company. The first exception taken upon his evidence was to the following question: "Mr. Davis, did you ever take any leases on the lands of the Ohio Oil Company?" This was objected to on the ground that it called for the conclusion of the witness. The witness' answer in effect was that he secured the leases that were taken by the company. This did not amount to parol evidence of the contents of the instruments, but merely showed that the witness was instrumental in negotiating the transaction. The next exception is to this question: "Did you ever see any deeds or title papers relating to the title of this property of the Ohio Oil Company?" This was objected to as incompetent. The witness answered that he never saw any deeds, and this, of course, obviated the objection. The next exception arose as follows: The witness, having been shown the copies of assignments of leases found by Mr. Chandler upon the records of Lorain county, was asked: "Did you ever see any other papers or documents of any kind concerning the title of that company to the property than the documents referred to in that paper, so far as the county of Lorain is concerned?" This was objected to, but the ground of the objection is not stated. The witness answered: "I never did." We see no ground for reversal here.

The next grounds assigned relate to the admission of certain questions asked of defendant upon cross-examination respecting statements made by him to Messrs. Phillips, Stadler and Wells, respectively, concerning the stock of the oil company, and the admission, as a part of plaintiff's rebuttal evidence, of the testimony of these three gentlemen to contradict

what defendant said upon cross-examination. One of the questions asked of defendant was: "Didn't you state to Mr. Phillips, at the time or just before he bought some of the stock through you, that you had engaged more of the stock than you felt able to carry, and that you would like your Atlantic City friends to take some of it from you, including him?" This was objected to on the ground that it did not contradict anything to which he had sworn. The question was admitted and an exception allowed. The witness answered in the negative. Similar questions were asked and, over like objection, admitted, respecting statements alleged to have been made by him to Mr. Stadler and to Mr. Wells, and negative answers were returned.

In rebuttal, plaintiff was permitted, over objection, to introduce the testimony of Phillips, Stadler and Wells to the effect that the statements which the defendant denied making had in truth been made by him. It is urged that since defendant's denials were brought out on cross-examination, and related to collateral matters, the plaintiff was bound by them, and the admission of rebuttal evidence upon these points was erroneous.

We might find difficulty in sustaining these judicial rulings but for the fact that defendant, while under cross-examination, instead of confining himself to simply answering the questions put to him, volunteered to say: "I never offered any of my stock for sale." This was plainly intended to lend color of truth to the testimony given by him on direct examination to the effect that he had not offered to sell any of his stock to the Shreves. Counsel for plaintiff might have moved to strike out the statement just quoted on the ground that it was not responsive to any question asked by him. Instead of pursuing this course, counsel treated the statement as a part of defendant's testimony given in his own behalf, the same as if it had been evoked by a question from his own counsel. So treating it, he proceeded to cross-examine upon it, with the result already shown, and not being content with the cross-examination, introduced the testimony of Phillips, Stadler and Wells to rebut defendant's statement that he had never

offered any of his stock for sale. In view of the liberality that obtains respecting the cross-examination of a party who offers himself as a witness, and in view of the fact that defendant himself was responsible for raising the side issue (if it was a side issue) as to his sales of stock to other than the plaintiff, we are not willing to say that the rulings now under consideration furnish ground for reversal.

The next ground relied upon is based upon an exception to certain testimony introduced by the plaintiff in rebuttal concerning what was 'said between Caleb E. Shreve, Peter Whitney and Eli H. Chandler on an occasion intervening between the commencement and the conclusion of the negotiations between Crosby and Shreve that resulted in the purchase of stock. At the interview in question a power of attorney was drawn up by Chandler and signed by Shreve authorizing Whitney to purchase for Shreve ten thousand shares of the oil company stock at seventy cents per share, without mention of the party from whom the purchase was to be made. The evidence of what was said between the three men on this occasion was admitted over objection, and it is now argued that it was inadmissible because hearsay, and also because it tended to vary a written instrument (for the power of attorney was already in evidence) by oral evidence of what took place at its signing. In order to vindicate the ruling of the trial justice, the following recital is proper: Upon plaintiff's principal case Caleb Shreve was a witness, and he having testified in effect that he bought the stock in question from Crosby, and not from Whitney, and that, as to ten thousand shares, he bought it for his wife, the attempt was made on cross-examination to get him to admit that, after the above-mentioned interview between himself and his wife and Crosby, at which Whitney was present, he went with Whitney to Chandler's office and there agreed to buy ten thousand shares of the stock from Whitney, and that the power of attorney was drawn up for the purpose of effectuating this purchase. Shreve admitted the signing of the power of attorney, but asserted that at the time he signed it he understood it was intended to protect Whitney in making an advance of $1,000

to Crosby on the ten thousand shares of stock until completion
of the pending negotiations between Shreve and Crosby.
Thereafter the defendant introduced the power of attorney as
a part of his own case. The instrument did not of itself evi-
dence any purchase of stock from Whitney, either by Mr. or
Mrs. Shreve. Neither did its terms negative a purchase by
the Shreves from Crosby of the stock in controversy. So far
as appears, the only pertinency of the document was to im-
peach the credibility of Shreve by showing that its contents
were inconsistent with his present testimony. Thereupon
the plaintiff in rebuttal undertook to prove what was said
between Whitney, Shreve and Chandler at the time the power
of attorney was drawn up and signed, in order to show that
whatever force the paper had as a declaration by Shreve incon-
sistent with his testimony upon the trial was explained away,
in part at least, by the circumstances under which it was
signed by him. We think this evidence was properly ad-
mitted. The paper did not purport to embody any contract
between the parties to the suit. The rule that parol evidence
will not be admitted to vary the terms of a written contract
(*Naumberg* v. *Young,* 15 *Vroom* 331) does not apply as be-
tween strangers to the contract, nor as between a party and a
stranger. 1 *Greenl. Evid.,* § 279; 11 *Am. & Eng. Encycl. L.*
(*2d ed.*) 550, and note; *First National Bank* v. *Dunn,* 26
*Vroom* 404. This paper was not evidential against the
plaintiff upon the main issue in the case, but only upon the
collateral issue whether Mr. Shreve was a trustworthy witness.
The fact that it was in writing was of no special significance,
save as it rendered it more convincing as evidence of the wit-
ness' former statement. Testimony of what transpired at the
time the paper was signed, explanatory of its purpose, was
admissible.

Another error alleged is with respect to the instructions of
the trial justice to the jury concerning the tender made by
plaintiff's representative to the representative of the defend-
ant upon rescinding the contract. The tender made, as al-
ready mentioned, comprised the certificates for the entire
sixteen thousand five hundred shares of stock and a check for

$330, that being the amount of a two per cent. dividend thereon. The judge was asked to charge the jury that the tender was not sufficient because the offer was only to return the amount of the dividend, without any interest thereon. This request was sufficiently answered by. the trial justice when he said that defendant's failure to object at the time for insufficiency of the tender, and his conduct in putting himself in the attitude of refusing to accept a rescission upon any ground amounted to a waiver of the objection that the amount tendered was insufficient.

Besides this, we are not at all clear that it was incumbent upon the plaintiff to tender back to Crosby the money that had been received by way of a dividend. Tender of the stock was of course necessary, but since the plaintiff, if entitled to rescind, was entitled to recover back from the defendant a much larger sum than the amount of the dividend she had received, there would seem to be no clear objection to her retaining the money as a payment *pro tanto* of what the doctor was bound to pay her, to wit, the entire purchase-price. However this may be, we are unable to perceive on what legal or equitable theory the duty is to be imposed upon the party injured in such a transaction to earn interest for the benefit of the wrong-doer upon any money that may have been received by way of dividends or profits prior to rescission.

We find nothing else in the record requiring particular discussion. The instructions of the trial judge to the jury are not open to any reasonable criticism from the defendant's standpoint. His requests to charge were acceded to, at least so far as they were well founded.

The judgment should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DIXON, GARRISON, FORT, GARRETSON, PITNEY, REED, BOGERT, VREDENBURGH, VROOM, GREEN. 12.

*For reversal*—None.